UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ADAM LACERDA,

    Petitioner,

v.

UNITED STATES OF AMERICA,

    Respondent.

Case No. 22–cv–00026–ESK

OPINION

**KIEL, U.S.D.J.**

    **THIS MATTER** comes before the Court on petitioner Adam Lacerda's motion to correct, vacate, or set aside his federal sentence under 28 U.S.C. § 2255 (2255 Motion). (ECF No. 4.) Respondent United States opposes the 2255 Motion. (ECF No. 18.) For the following reasons, I will deny the 2255 Motion. I decline to issue a certificate of appealability.

    **I.**    **FACTS AND PROCEDURAL HISTORY**

        **A.**    <u>Criminal Proceedings and Direct Review</u>

    I adopt the underlying facts of petitioner's convictions as set forth in the United States Court of Appeals for the Third Circuit's precedential decision denying petitioner's direct appeal:

> The Vacation Ownership Group ("VOG") billed itself as a sort of advocacy group helping victims of timeshare fraud get out of their timeshare debts. After a lengthy and complex trial, a jury determined that VOG had in fact defrauded its customers, and that Adam Lacerda, Ian Resnick, and Genevieve Manzoni were each knowing participants in that fraud.
>
> ....

In 2009, while working for Wyndham Vacation Resorts, Inc. (a timeshare sales company), Adam Lacerda and his wife, Ashley Lacerda, founded VOG. VOG marketed itself as a timeshare consulting company and claimed that it could help customers cancel, purchase, or upgrade their timeshares. Lacerda was the president and chief executive officer of VOG, and his wife was the chief operating officer. Together, they exclusively controlled VOG's bank accounts and post office box.

Lacerda created phone scripts for VOG's sales representatives to use when speaking with timeshare owners. One of these scripts was VOG's "bank settlement" pitch. This sales pitch was riddled with misrepresentations. Following this script, the VOG representatives used personal information compiled by VOG in "customer lead sheets" to make unsolicited calls to unsuspecting timeshare owners. The representatives said they were calling on behalf of a property owners' association to follow up on the owner's recent complaints. This was not true. The representatives also claimed they were working with the bank that held the loan for the owner's timeshare mortgage. This was also not true. They then promised to review the owner's account—which they could not do because they had no access to that account—and then to call the owner back.

During a follow-up call, VOG representatives offered to settle the timeshare owner's debt at a fraction of the remaining balance, for a negotiated fee. Later, during a closing call, the representatives had the timeshare owner electronically sign VOG's contract and pay its fee. The representatives then promised that the "mortgage would be paid off in full" and the timeshare owner would receive a "deed free and clear." But none of that happened. Instead, VOG just pocketed the money.

Lacerda also trained his VOG employees to use a fraudulent phone script for a timeshare

"cancellation" sales pitch. Again, VOG representatives made unsolicited calls to timeshare owners and falsely told them that VOG had received their complaints, that VOG would do all the necessary work to cancel the owners' timeshares, and that cancellation would not damage the customers' credit ratings.

But VOG did not work to cancel the owners' timeshares. Instead, after receiving the timeshare owners' money, VOG sent them an eight-step process for cancelling the timeshares themselves and told them to stop making their loan payments. Eventually the timeshare owners received default notices from the timeshare developers. When the owners complained to VOG, VOG instructed them to allow the developers to foreclose. Typically, this would lead to a nonjudicial foreclosure proceeding, which is common in the industry. This proceeding, Lacerda knew, would result in the cancellation of the owners' timeshare debt, but at the cost of the timeshare deed, any equity the owners had, and, of course, the owners' credit ratings.

VOG employed additional misrepresentations: Lacerda impersonated bank officials on calls, altering his voice and using a spoofing device to alter his phone number. And VOG's website falsely displayed the Better Business Bureau seal, advertising itself as an A+ rated business, and claimed to be a member of the American Resort Development Association.

Not even the names used at VOG were true. Under Lacerda's direction, VOG representatives used false names while interacting with potential customers. These false names allowed Lacerda and other former Wyndham employees to violate their non-compete agreements and hide their identity from former clients at Wyndham. This was important because VOG's customer lead sheets were comprised almost exclusively of Wyndham timeshare owners.

3

> ….
>
> In November 2010, the FBI raided VOG's offices and the Lacerdas' home. Several VOG representatives left the company following the raid … . So Lacerda convened an office-wide meeting where his lawyers, including Marc Neff, assured VOG staff that everything was okay. They told the employees that only Lacerda was under investigation, and that Neff had reviewed the sales scripts and verified that everything was legal. VOG abandoned the bank settlement pitch and revised the timeshare cancellation pitch to remove any references to working with the banks, while leaving many other misrepresentations in place. With these assurances and changes, many of VOG's representatives … returned and VOG resumed and expanded its operations.

*United States v. Lacerda*, 958 F.3d 196, 204–07 (3d Cir. 2020).   Petitioner was indicted on May 3, 2012 for one count of conspiracy to commit mail fraud and wire fraud, 18 U.S.C. §§ 2, 1349; 10 counts of mail fraud, 18 U.S.C. § 1341; three counts of wire fraud, 18 U.S.C. § 1349; and one count of conspiracy to commit money laundering, 18 U.S.C. § 1957. *United States v. Lacerda*, No. 12–cr–00303 (D.N.J.) ("Crim. Case") (ECF No. 12.)[1]  A superseding indictment was issued on January 23, 2013 that charged petitioner with 19 counts: one count of conspiring to commit mail and wire fraud, ten counts of mail fraud, three counts of wire fraud, one count of conspiracy, and four substantive counts of money laundering.   (Crim. Case ECF No. 79.)

On November 8, 2012, the United States moved to disqualify Neff as petitioner's trial counsel. (*Id.* ECF No. 56 (Disqualification Motion).) According to the United States,

> Mr. Neff addressed the conspirators at the request of Adam Lacerda after the FBI searched the defendants'

---

[1] I take judicial notice of the public filings in petitioner's criminal case.

4

> offices on November 4, 2010. Mr. Neff told the conspirators that Adam Lacerda's planned sales pitches to continue the conspiracy were lawful, when in fact those pitches were fraudulent. Mr. Neff also told the conspirators that only Adam Lacerda and his wife Ashley were targets of the FBI's investigation, which was not correct. Mr. Neff's speech persuaded conspirators concerned by the FBI search to continue working, and the charged conspiracy continued defrauding victims for another nine months. Mr. Neff's participation in this key event makes him a potential trial witness for the government and for the defense, and the well-established prohibition against acting as both trial counsel and trial witness requires his disqualification.
>
> In addition, given that witnesses will testify that Mr. Neff participated in an event that promoted the conspiracy, he has a personal interest in making sure that the evidence adduced at trial does not show that he knowingly engaged in conduct that would subject him to either criminal liability or disciplinary action. His personal stake in this case conflicts with his duty to defend his client, as it may be in Adam Lacerda's best interest to present evidence showing that Mr. Neff knew all about the fraudulent activities and knowingly endorsed them.

(ECF No. 56–1 pp. 1, 2.) Petitioner retained Mark Cedrone, Esq. to represent him "for the *limited* purpose of defending his interests 'in connection with the government's … Motion to Disqualify Counsel for Adam Lacerda." (ECF No. 4–2 Declaration of Mark Cedrone, Esq., (Cedrone Dec.) ¶ 10 (emphasis in original).) On December 6, 2012, Cedrone filed opposition to the Disqualification Motion, arguing that disqualifying Neff would deprive petitioner of his Sixth Amendment right to the counsel of his choice. (Crim. Case ECF No. 68 pp. 6, 7.) Cedrone further argued that petitioner would "waive any conflict that might be presented by the evidence." (*Id.* p. 2.)

District Judge Noel L. Hillman granted the Disqualification Motion on March 7, 2013. (Crim. Case ECF No. 116.)

5

> Given that Mr. Neff, the attorney representing the head of the company, spoke about a topic applicable to all VO Group employees at the company's offices in the presence of a private investigator, it would not be surprising that one or more employees may have mistakenly believed that he was providing legal advice to them or applicable to them and acting with their—or at least the company's—best interest in mind. Indeed, regardless of whether Mr. Neff specifically stated that he was "Adam Lacerda's attorney," the average layperson may have difficulty differentiating between representation of the head of the company and the company and its employees as a whole in this context.
>
> Such a situation lends to a defense that VO Group employees believed that their actions going forward were lawful based on the advice of an attorney. Accordingly, should a co-Defendant raise the advice of counsel defense at trial and the fact-finder accepts it, Mr. Neff's representation of his client will be impaired … .

(*Id.* ECF No. 115 pp. 22, 23.)  On May 17, 2013, Judge Hillman denied Cedrone's request for a continuance.  (*Id.* ECF No. 160.)

Trial commenced on July 16, 2013.  (*Id.* ECF No. 243.)  On September 3, 2013, Judge Hillman dismissed Counts 21, 30, 31, 35, and 36–40 with prejudice. (*Id.* ECF No. 326.)  Petitioner was convicted on the remaining 13 charges: conspiracy to commit mail fraud and wire fraud, nine counts of mail fraud, and three counts of wire fraud.  (*Id.* ECF No. 429.)  The Third Circuit upheld these convictions and the resulting sentence of 324 months, three years of supervised release, and $ 2,679,656.09 restitution.  *Lacerda*, 958 F.3d at 214–18.

### B.  <u>Collateral Review Proceedings</u>

On January 3, 2022, petitioner filed his original § 2255 motion.  (ECF No. 1.)  Petitioner submitted a revised 2255 Motion on January 8, 2022.  (ECF No. 4.)  The 2255 Motion includes three claims for relief:

1. Neff was laboring under a conflict of interest that adversely affected Neff's representation.

2. Neff violated Lacerda's right to autonomy by failing to disclose that Neff's communications with VOG staff were criminal.

3. Cedrone violated Lacerda's rights to autonomy and counsel of choice.

(*Id.* pp. 12, 14, 17.)   Judge Hillman issued an order to answer on January 19, 2022.  (ECF No. 5.)

On April 28, 2022, the United States moved for an order granting it permission to speak with Neff and Cedrone regarding petitioner's ineffective assistance of counsel claims.  (ECF No. 8.)   It also asked for Judge Hillman to order Neff and Cedrone to affirmatively produce relevant documents.  (ECF No. 8–1 at 2.)   Petitioner opposed the motion.  (ECF No. 10.)   Judge Hillman granted the motion in part and denied the motion in part on June 16, 2022.  (ECF No. 15.)   He concluded that petitioner had waived the attorney-client privilege as to the claims raised in the 2255 Motion, but that the waiver was limited "'to attorney-client communications that are necessary for the resolution of the claims at hand.'"   (ECF No. 14 p. 5 (quoting *Ragbir v. United States*, No. 17–cv–01256, 2018 WL 1871460, at *3 (D.N.J. Apr. 19, 2018)).)   Judge Hillman denied the United States's request to order Neff and Cedrone to speak with the United States or affirmatively produce records.   "The United States may request an interview and documents that are within the scope of [p]etitioner's waiver from former counsel, but the Court will not issue an order at this time that either requires or forbids their cooperation."   (ECF No. 14 pp. 8, 9.)   The parties were advised that they could apply to Judge Hillman for discovery if necessary.  (*Id.* p. 9 (citing 28 U.S.C. § 2255 Rule 6).)

The United States submitted its opposition on July 28, 2022, (ECF No. 18), and petitioner filed a reply on September 26, 2022, (ECF No. 21.)  The matter was reassigned to me on March 26, 2024.  (ECF No. 22.)

### C. <u>Evidentiary Hearing</u>

A district court must hold an evidentiary hearing on a § 2255 motion unless the "motion and the files and records of the case conclusively show" that the movant is not entitled to relief.  28 U.S.C. § 2255(b); *see also United States v. Arrington*, 13 F.4th 331, 334 (3d Cir. 2021).  On March 1, 2025, I concluded that an evidentiary hearing was required. (ECF No. 24.)  The parties appeared for a hearing on June 10, 2025.  (ECF No. 33.)

Petitioner testified on his own behalf.  (*Id.*)  He stated that Neff began representing him in November 2010, and that he began asking Neff about the possibility of pleading guilty and cooperating with the United States as soon as the indictment was issued.  (ECF No. 37 p. 6.)  He claimed that Neff said "he would look into it," but later told petitioner that "it didn't seem like there was any interest."  (*Id.* pp. 6, 7.)  Petitioner asserted that Neff never explained what an open plea was or that it was a possibility.  (*Id.* p. 7.)

Petitioner further testified that he did not know Neff had a conflict until he met Neff and Cedrone at Cedrone's office shortly after the United States filed the Disqualification Motion.  (*Id.* p. 8.)  This meeting was also allegedly the first time petitioner learned about the Disqualification Motion. (*Id.*) According to petitioner, Neff and Cedrone categorized the Disqualification Motion as a "bully tactic" and "standard practice." (*Id.* pp. 8, 16.)  Petitioner asserted he never received a copy of the Disqualification Motion or the opposition papers that Cedrone submitted. (*Id.* pp. 9, 10.) Petitioner characterized the meeting as being "really geared towards … the fee [petitioner] was going to have to pay Cedrone and the hourly rate."  (*Id.* p. 8.)

8

Former Assistant United States Attorney Alyson Oswald, one of the government attorneys who prosecuted the criminal case, testified on the United States's behalf. (*Id.* p. 37.) She testified that the United States Attorney's Office never opened a criminal investigation into Neff's conduct at the meeting and that she would not have entered into a cooperation agreement with petitioner. (*Id.* p. 40.) She further testified that even if petitioner had volunteered information, she would not have found it to be credible. (*Id.* p. 41.)

Petitioner submitted a post-hearing memorandum on June 24, 2025. (ECF No. 36.)[2] The United States submitted its supplemental brief on June 30, 2025. (ECF No. 38.)

## II. LEGAL STANDARD

"[A] defendant in federal custody may file a motion collaterally attacking his sentence based on certain specifically listed grounds, namely that the sentence was imposed in violation of the Constitution or federal law, that the court was without jurisdiction to impose the sentence, that the sentence exceeded the maximum authorized by law, or that the sentence 'is otherwise subject to collateral attack[.]'" *United States v. Peppers*, 899 F.3d 211, 220 (3d Cir. 2018) (quoting 28 U.S.C. § 2255(a) (second alteration in original)).

## III. DISCUSSION

### A. Abandoned Claims

In his post-hearing submission, petitioner states that "he has elected to proceed solely on Ground One of his § 2255 motion. All other grounds are abandoned." (ECF No. 36 p. 3.) Therefore, I will dismiss Grounds Two and Three of the 2255 Motion with prejudice.

---

[2] Petitioner's post-hearing submission withdraws Grounds Two and Three and addresses the issue of judicial estoppel, which I raised *sua sponte* at the hearing. (ECF No. 36 p. 1.) As the remaining claim is easily denied on its merits, I decline to consider the judicial estoppel argument further.

### B. Credibility Determinations

Petitioner submitted a sworn declaration in which he asserts that he "told Neff early on that [he] was willing to cooperate and asked if the Government would give [him] a plea deal." (Declaration of Adam Lacerda (Larceda Dec.) ECF No. 32 ¶ 5.)) During the evidentiary hearing, he testified that he began asking Neff about the possibility of pleading guilty and cooperating with the United States as soon as the indictment was issued. (Evidentiary Hearing Tr. p. 6.) I do not find this testimony to be credible.

"Petitioner maintained his innocence throughout the trial, belying the contention that he would have accepted a deal." *Mines v. United States*, No. 10–cv–05163, 2013 WL 6187185, at *5 (D.N.J. Nov. 26, 2013); *see also United States v. Tarnai*, 782 F. App'x 128, 132 (3d Cir. 2019) (finding petitioner had "not established the government would have allowed him to take the plea while insisting on his innocence.") At sentencing, Judge Hillman commented on petitioner's "complete lack of recognition of the overwhelming evidence in this case, [his] efforts at obstruction, and [petitioner's] continual denial of the obvious." (Crim. Case ECF No. 446 p. 78.) Petitioner's continued refusal to accept responsibility contradicts his testimony that he was ready to plead guilty, with "nothing off the table," and cooperate as of November 2010. (ECF No. 37 p. 7; Lacerda Dec. ¶ 5.)

Additionally, once Cedrone took over as counsel, he advised petitioner that going to trial was the best option due to the anticipated Guideline range of 135 to 168 months. (ECF No. 4 p. 8; Lacerda Dec. ¶ 16; ECF No. 37 p. 22.) Petitioner agreed at the hearing that it "[r]easonably … makes sense" that he would not have entered in an open plea, with a range of 324 to 405 months, if he decided to go to trial with a lower Guideline range. (ECF No. 10 pp. 19, 20; ECF No. 37 p. 22.)

Petitioner's long history of deception also supports this conclusion. He was convicted of lying to people in order to get them to pay money to VOG and directing VOG employees to do the same, and "his efforts at obstruction in this case began early and continued all the way up through the jury's verdict in this matter, and it took myriad forms." (Crim. Case ECF No. 446 p. 24.) When he was confronted with this history of obstruction during cross-examination, petitioner was evasive and belligerent and continued to assign blame to everyone but himself. (*See, e.g.,* ECF No. 37 pp. 22, 23, 25, 27, 29, 30.) Judge Hillman characterized petitioner as "a pathological liar, someone who is so adept and so comfortable, so morally corrupt that they believe their own lies, denying over and over again what is plain from the overwhelming evidence in this case … ." (Crim. Case ECF No. 446 pp. 25, 26.) After reviewing the underlying criminal case, the submissions of the parties, and the evidence presented during the evidentiary hearing, I find petitioner's testimony to be wholly unworthy of belief.

### C. Actual Conflict

"As a general matter, a defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Mickens v. Taylor*, 535 U.S. 162, 166 (2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "There is an exception to this general rule. We have spared the defendant the need of showing probable effect upon the outcome, and have simply presumed such effect, where assistance of counsel has been denied entirely or during a critical stage of the proceeding." *Id.* (citing *United States v. Cronic*, 466 U.S. at 658–59). "When that has occurred, the likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary. But only in 'circumstances of that magnitude' do we forgo individual inquiry into whether counsel's inadequate performance undermined

the reliability of the verdict." *Id.* (citing *Cronic*, 466 U.S. at 659 n. 26.) One such "circumstance of that magnitude" is when "the defendant's attorney actively represented conflicting interests." *Id.*

"[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler v. Sullivan*, 446 U.S. 335, 349–50 (1980); *see also United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir. 1988).

To succeed, petitioner must "prove that (1) an actual conflict of interest existed and (2) the conflict adversely affected the adequacy of representation." *Harmer v. Superintendent Fayette SCI*, No. 19–03146, 2021 WL 3560666, at *3 (3d Cir. Aug. 12, 2021) (citing *Cuyler*, 446 U.S. at 349–50; *Gambino*, 864 F.2d at 1070). "An actual conflict is evidenced if, during the course of the representation, the [petitioner's] interests diverge with respect to a material factual or legal issue or to a course of action." *Id.* (internal quotation marks omitted). An "adverse effect turns on whether some plausible alternative defense strategy or tactic might have been pursued that was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Id.* (internal quotation marks omitted). Put differently, petitioner does *not* need to prove that he would have pleaded guilty if he had been represented by an unconflicted attorney during plea negotiations. *See Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004). He *does* need to prove that Neff's conflict was the reason Neff did not pursue an open plea option. *See Burkhart v. United States*, 27 F.4th 1289, 1296 (7th Cir. 2022) ("The proper focus is instead on whether the defense counsel's conflict affected his actions and the defendant's decision to plead guilty, not whether another attorney without conflict would have made the same recommendation." (internal quotation marks omitted)).

It is undisputed that there was an actual conflict prior to Neff's disqualification. *See Lacerda*, 958 F.3d at 212 (affirming Neff's disqualification). I find that petitioner has failed to prove that Neff's conflict adversely affected his representation of petitioner, however.

Petitioner argues that Neff's conflict of interest adversely affected his trial performance because he failed to inform petitioner of his plea options. "Neff's interest in protecting himself from prosecution caused Neff to not explain to Lacerda that he had a right to enter an open plea to the indictment in the case." (ECF No. 4 p. 13.) Even if I were to believe that petitioner asked Neff to immediately commence plea options with the United States, which I do not for the reasons discussed *supra*, petitioner has not shown that Neff failed to do so *because* he was worried about his own criminal or ethical liability. *See Tormasi v. Att'y Gen. New Jersey*, No. 23–01452, 2025 WL 688925, at *8 (3d Cir. Mar. 4, 2025) (denying § 2254 conflict claim because "there is no support for [petitioner's] final contention that [counsel] failed to engage in meaningful plea negotiations *because* he was conflicted" (emphasis added)).

Petitioner's entire argument is grounded in the assumption that Neff's conflict automatically rises to the level of an adverse effect. However, "[t]o reach the level of constitutional ineffectiveness the conflict 'must cause some lapse in representation contrary to the defendant's interests but such lapse need not rise to the level of actual prejudice.'" *Gambino*, 864 F.2d at 1070 (quoting *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir. 1983)); *see also Taylor v. Superintendent Dallas SCI*, No. 23–02511, 2024 WL 4449417, at *4 (3d Cir. Oct. 9, 2024) ("A defendant still must prove adverse effect—namely, that the actual conflict caused some lapse in representation contrary to his interest." (cleaned up)). Petitioner has not presented any evidence that shows Neff was motivated by his conflict when he allegedly did not discuss an open plea with petitioner or the United States. Petitioner's assumptions and speculation

13

about Neff's motivations are not enough to warrant relief pursuant to *Cuyler* and *Gambino*. Therefore, I will deny petitioner's 2255 Motion.

### D.  *Strickland* Standard

"[I]f the defendant cannot prevail on an actual conflict theory, the defendant can still bring a conventional ineffective assistance claim under *Strickland*, but the defendant must then show prejudice." *United States v. Morelli*, 169 F.3d 798, 810 n. 15 (3d Cir. 1999). However, petitioner has waived this argument because he specifically argued that *Strickland* was "the wrong standard for [petitioner's] conflict claim." (ECF No. 21 p. 2.) Therefore, I decline to consider whether petitioner has satisfied *Strickland*'s requirements. *See Tueros v. Greiner*, 343 F.3d 587, 592 (2d Cir. 2003) ("[P]etitioner failed to present a *Strickland* argument to this Court in his brief, and expressly disclaimed the applicability of *Strickland* during oral argument, so we consider petitioner's *Strickland* argument to have been abandoned.")

### IV.  CERTIFICATE OF APPEALABILITY

An appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2255 unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. § 2253(c)(1)(B). I decline to issue one.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Here, I decline to issue a certificate of appealability because jurists of reason would agree that petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2).

## V. CONCLUSION

For the reasons stated above, Grounds Two and Three are dismissed with prejudice. Section 2255 relief is denied on Ground One. No certificate of appealability shall issue. An appropriate Order accompanies this Opinion.

                                                                            */s/ Edward S. Kiel*
                                                                            **EDWARD S. KIEL**
                                                                            **UNITED STATES DISTRICT JUDGE**

Dated: July 11, 2025